UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
RITA ALBERTI, MICHAEL CALIFANO,
FRANK M. FRANZESE, JR., PETER J.
NIGRA, and PETER VISCONTI,

                 **MEMORANDUM & ORDER**

            Plaintiffs,          02-CV-2542 (DRH)(ETB)

        -against-

COUNTY OF NASSAU,
             Defendant.
--------------------------------------------------------X
**A P P E A R A N C E S**

**LOUIS D. STOBER, JR., ESQ.**
Attorney for Plaintiff
350 Old Country Road, Suite 205
Garden City, New York 11530-1701

**LORNA B. GOODMAN, NASSAU COUNTY ATTORNEY**
Attorney for Defendant
One West Street
Mineola, New York 11501-4820
By: Nancy Nicotra, Esq., and Donna A. Napolitano, Esq.

**HURLEY, District Court Judge:**

*INTRODUCTION*

       The above-captioned Plaintiffs are all registered and active Republicans who

were employed by Nassau County until their termination in December 2001 or January 2002

by the then newly-elected Democratic county administration. The Plaintiffs allege that the

incoming administration based their terminations solely upon political affiliation, in violation of the First Amendment and New York Labor Law § 201-d. The Plaintiffs also claim that the incoming administration's refusal to compensate them for accrued "compensatory time" was a "violation of 42 U.S.C. 1983," the Fair Labor Standards Act, and Section 3.30(b) of the Nassau County employee benefits handbook. Finally, the Plaintiffs allege that the manner in which their termination was executed violated Nassau County Administrative Code § 22-2. Nassau County has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motion is granted.

## BACKGROUND

Plaintiff Rita Alberti is an attorney, and served as "Counselor" in the Nassau County Office of Housing and Intergovernmental Affairs, which receives federal housing funds. Alberti Depo at 41. In this capacity, she reviewed legal documents received by the Office, drafted legal forms, answered subpoenas, did legal research for "the people who ran the Section 8 program," and served as "liason to the Legislature." Deft. R.56.1 Statement ¶ 15, and Pltf. R.56.1 Statement ¶ 15, Alberti Depo at 41. In the latter capacity, she says, she sat in the audience during Legislative sessions and answered any of the legislators' "basic" questions regarding the Housing Office; but if the issues raised were not "within the realm of the ordinary," the Commissioner or Director would answer instead. Alberti Depo. at 44-45. Alberti did not supervise anybody else in this role, and was the only Counselor in the Housing Office, which, she says, retained outside counsel to work on litigation already in progress when

she arrived, and to handle "major loans." Alberti Depo at 43. Alberti's salary in this position was $75,000, Alberti Depo at 48, and she was exempt from protection under New York's Civil Service Law. Pltf. Memo at 23.

Plaintiff Michael Califano served as Nassau County's "Manager of Budget Analysis." Deft. Exh. A. He was appointed to this position in 1983 by then-County Executive Fran Purcell. Califano Depo at 10. His resume states that in this capacity, he served, from 1983 until his termination, as "budget examiner" for eight county departments, and a "member of the negotiating team for Nassau County." Pltf. Exh. 4. According to Califano, as Manager of Budget Analysis, "I would review the budgets that were submitted by the various departments that I was responsible for," including recreation and parks, culture development, police department headquarters, . . . correctional center, sheriff." Califano Depo. at 10-11. According to Califano, his duty as far as the submitted budgets was "[t]o review the reasonableness of the requests that are coming in," particularly whether a department's request was notably larger than in the previous year's budget. Califano Depo. at 14. Califano further indicated that after his review of budgetary requests, the Budget Director would often decide that certain requests were unreasonable and instruct him to pare down such requests by a certain percentage. Califano Depo at 17-18.

Califano also sat on the "Capital Committee," which "used to review requests made by the department of capital projects," and "approv[ed] equipment for the various departments." Califano Depo at 11. According to Califano, when a department would put in a request to purchase equipment, "myself and a group of other people would discuss the

projects that they were asking for." Califano Depo at 11. Califano states that his Committee only "review[ed] the items [requested] just to see if they looked like they were reasonable," and if so, would "[f]orward it on to the Senior Committee who would then make the decision as to whether or not they would be purchased." Califano Depo at 13. Califano would then attend the "senior committee" meetings, which were closed to the public, ostensibly as an observer. Califano Depo at 13. Califano also attended meetings of the Legislature, and as a member of the Capital Committee, he alone was assigned by the Budget Director to "represent" the Budget Department at "county negotiations." Califano Depo at 18, 21. "Representing," according to Califano, simply meant "being there" and "listening." Califano Depo at 21.

In 1995, Califano moved to the County's Correctional Center, although he apparently remained an employee of the Budget Office. Califano Depo at 22. Califano was chosen for the correctional center job after interviewing with then-County Executive Thomas Gulotta, who appointed him on the spot. Califano Depo at 27-28. Califano described his duty at the Correctional Center as "review[ing] the correctional center budget," and where appropriate, recommending staff increases to reduce overtime costs. Califano Depo at 23. Califano also stated that he attended "management meetings" with the sheriff, closed to the public. Califano Depo. at 25. While Califano states that at these meetings "[w]e . . . reviewed different policies that they had at the correctional center," he also states that "I was more a spectator there," and simply "trying to educate myself as to what they were doing." Califano Depo. at 25. Califano states that as "liaison between the correctional center and the county,"

"[i]f the budget director wanted to get to the sheriff, say anything to him, he would tell me and [I] in turn would go to the sheriff." Califano Depo at 26. At the correctional center, Califano had no staff under him, nor supervisors over him. Califano Depo at 26.

Califano was exempt from protection under the Civil Service Law. Pltf. Oppn. at 23. While he had earned roughly $69,000 annually as Budget Examiner, upon commencement of his work at the correctional center, his salary was raised to $76,000, following negotiations with Gulotta," who "felt that I had earned it." Califano Depo at 27.

Plaintiff Frank M. Franzese, Jr. served as "Assistant to the Coordinator of Housing." Pltf. Exh. 7. According to Franzese's resume, his duties as Assistant included "[a]ssist[ing] the Commissioner of Housing in the administration of over $21 million of federally funded housing projects," and "[s]upervis[ing] staff of over 40 employees and direct[ing] outside consultants and subcontractors in the determination of the proper administration of the guidelines and directives set forth by the U.S. Department of Housing and Urban Development." Pltf. Exh.7. According to Franzese's deposition testimony, as Assistant to the Coordinator, he "assisted the commissioner or the coordinator," "ma[de] sure that whatever the commissioner wanted was done," and "did whatever had to be done, and [] did it according to the regulations," and "[b]ased on [the Commissioner's] decisions, [] carried out his requests." Pltf. R.56.1 Statement ¶ 57. He also "offered his opinions on certain suggestions by the Coordinator." Pltf. R.56.1 Statement ¶ 58. At the time of his terminations, Franzese's annual salary was $70,000, and he was exempt from protection under New York's Civil Service Law. Franzese Depo at 30; Pltf. Memo at 24.

Plaintiff Peter J. Nigra is a self-described "CPA with over 30 years of diverse experience." Pltf. Exh.8. At the time of his termination, his official title was "Budget Examiner for Nassau County," in which capacity he worked with several Nassau County departments. His duties included "prepar[ing] monthly projections, analyz[ing] their expenditures, control[ling] their spending by approving or disapproving of their purchases, pass[ing] supplemental appropriations, [and] do[ing] board transfers on various line items when needed based on my knowledge of the department and their needs and their projections." Nigra Depo. at 24. Nigra explained that "every purchase that [a] department made would need to be approved by the budget examiner who was handling that particular department," and as one such examiner, "I would have the right to question purchases that were being made and to give approval on those purchases if I saw the need within the department and if I saw that they were staying within their budget." Nigra Depo. at 29-30. Thus, "[i]f the fire marshal came in and said we need new chairs . . . and they want to buy $350 chairs, and I say 'No you can't. You buy $200 chairs.' That's how you control their spending." Nigra Depo. at 29. Nigra described one of his job duties as "enforcing the county executive's budget." Nigra Depo. at 31. Nigra's salary at the time of his termination was apparently $56,732, see Pltf. Exh. 17, and he was exempt from protection under New York's Civil Service Law. Pltf. Oppn. Memo at 24.

Plaintiff Peter Visconti is an attorney admitted to the New York Bar. Deft. Exh.7. His official title at termination was "Legislative Liaison," Deft. Exh. A, a position that had been offered to him through a personal telephone call from then-County Executive Gulotta. Visconti Depo. at 13. Visconti described his duties as follows: "I acted as a go-between

between the county legislature and the county executive. If the county legislature needed some information from whatever departments, they would contact me, I would contact the department head and see to it that they got the information." Visconti Depo. at 14. Visconti's direct supervisor was Howard Taylor, Counselor to the County Executive; Visconti stated, "I would report to him. I would go to the legislative meetings, and after the meetings I would go to Howard and say what transpired." Visconti Depo. at 14-16. Visconti also served on the "capital projects committee," which determined by group vote which proposed capital projects would be put on the legislative agenda. Visconti Depo at 18-19. Visconti was exempt from protection under New York's Civil Service Law, and his salary at the time of his termination was $60,000. Pltf. Memo at 24; Visconti Depo at 27.

In November 2001, Democrat Thomas R. Suozzi was elected Nassau County Executive, and in late December 2001 or early January 2002 his "Transition Appointment Committee" informed each Plaintiff that she or he was to be terminated. Each Plaintiff was then formally terminated by the incoming Director of Personnel — and not their respective department heads. Alberti, Califano, Nigra, and Visconti claim to have worked significant amounts of overtime prior to their termination. They claim that in lieu of monetary payments for this overtime, Nassau County "promised" them "compensatory time [off]" at a rate of time and one-half, but failed to compensate them for, or allow them to use, this time prior to their terminations. Complaint ¶¶ 49-52. On or about March 28, 2002, each Plaintiff served Nassau County with a "Notice of Claim," pursuant to Section 50-e of New York's General Municipal Law. On April 29, 2002, the Plaintiffs commenced the present lawsuit. The Defendants

submitted this motion on September 17, 2004.

## DISCUSSION

I.    *Summary Judgment: Legal Standards*

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 67 (2d Cir. 1998).   It is the responsibility of the party moving for summary judgment to offer admissible evidence showing the absence of any genuine issue of material fact.   *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Fed. R. Civ. P. 56(c)).   It is the responsibility of the party opposing summary judgment to offer admissible evidence setting forth specific facts that show that *there is* a genuine issue of material fact to be tried.   *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).   The responsibility of a district court deciding a motion for summary judgment is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994)).   The court must therefore resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing a summary judgment motion. *Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).   "If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable." *Folkes v. N.Y. Coll.*

*of Osteopathic Med.*, 214 F. Supp.2d 273, 279 (E.D.N.Y. 2002) (citing *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996)).

Nevertheless, a party opposing summary judgment must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings or on mere conclusory statements.  *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

II.     *Counts I and II of the Complaint, Alleging "Violations of 42 U.S.C. 1983," Must Fail.*

A.     *There is no such thing as a "violation of 42 U.S.C. 1983."*

Counts I and II of the Complaint are both entitled "Violation of 42 U.S.C. 1983." A valid Section 1983 claim alleges *both* that the plaintiff was deprived of a right secured by the Constitution or laws of the United States, *and* that the defendant deprived him of this right under color of state law.  *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  It is well-established that Section 1983 *only* "provides a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)).  Section 1983 does *not* create any substantive rights, and thus

"one cannot go into court and claim a 'violation of § 1983' — for § 1983 by itself does not protect anyone against anything."*Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). District courts have accordingly dismissed complaints purporting to state a cause of action solely for the "violation of section 1983." *See, e.g., Hairston v. N.C. Agric. & Technical State Univ.*, No. 04 Civ. 1203, 2005 WL 2136923, at *9 (M.D.N.C. Aug. 05, 2005); *and Levanti v. Tippen*, 585 F. Supp. 499, 503-04 (S.D. Cal. 1984). To the extent that the Plaintiffs are similarly purporting to state a cause of action solely for the "violation of 42 U.S.C. 1983," their first two causes of action must be dismissed.

B.     *The Plaintiffs Have Also Failed to Adequately Allege Any Procedural Due Process Deprivation.*

The Complaint mentions in passing that it seeks redress for violations of "rights secured by the Fourteenth Amendment," Complaint at ¶ 1, although it never specifies the rights to which it refers. Count I does state that their termination "deprive[d] Plaintiffs of their vested property rights in so much as the loss of compensation and benefits of employment has caused and will continue to cause Plaintiffs to suffer monetary loss." Count II suggests that the Defendants also deprived the Plaintiffs of vested property rights in the form of the compensatory time that they earned, but were not given or paid for, prior to their terminations. Thus, although neither the Complaint nor the Plaintiffs' opposition memorandum specifies which Fourteenth Amendment rights were actually violated, the first two causes of action suggest claims for procedural due process deprivations. Generously assuming that the

Plaintiffs have adequately raised and briefed these causes of action,[1] they nevertheless must fail.

The Fourteenth Amendment prohibits a state from depriving any person of his or her property without "due process of law." *Dusenbery v. U.S.*, 534 U.S. 161, 167 (2002). But "the Constitution protects property interests, it does not create them." *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 629 (2d Cir. 1996), *cert. denied*, 519 U.S. 1150 (1997). Property interests are instead created by other sources, such as state law, which "secure certain benefits and that support claims of entitlement to those benefits." *Id.* (internal quotation omitted). The Supreme Court has explained that property rights "protect those claims upon which people rely in their daily lives," *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972), and to have a property interest protected by due process, a plaintiff must have more than a "unilateral expectation" of some future benefit — he must have a "legitimate claim of entitlement" to that benefit. *Id.* In this case, the Plaintiffs can establish a legitimate claim of entitlement to *neither* their future employment compensation and benefits, *nor* their accrued compensatory pay.

1. *The Plaintiffs' termination did not deprive them of vested property rights.*

---

[1]      *See U.S. v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority or by showing why it is a good point despite a lack of authority . . . forfeits the point. We will not do his research for him"); *and Diamond v. Chulay*, 811 F. Supp. 1321, 1335 (N.D. Ill. 1993) ("A 'skeletal argument,' unsupported by relevant authority or reasoning, is merely an assertion which does not sufficiently raise the issue to merit the court's consideration.").

As noted, the Plaintiffs' first cause of action suggests that their termination, by depriving them of compensation and benefits, deprived them of their "vested property rights." This suggestion is utterly contradicted by well-established precedent.

In New York, employment is presumed to be at will, and thus " 'terminable at any time by either party.' " *Baron v. Port Auth. of N.Y. & N.J.*, 271 F.3d 81, 85 (2d Cir. 2001) (quoting *Sabetay v. Sterling Drug, Inc.*, 506 N.E.2d 919, 920 (N.Y. 1987)). And employees that are exempt from protection under New York's civil service law will be deemed at-will, *Carfora v. City of New York*, 705 F. Supp. 1007, 1009 (S.D.N.Y. 1989) (citing *Voorhis v. Warwick Valley Cent. Sch. Dist.*, 459 N.Y.S.2d 325 (App. Div. 1983)), unless they can show that some other, more specific provision of the law protects their employment. *See de Zarate v. Thompson*, 624 N.Y.S.2d 281, 281 (App. Div. 1995). It is also well-settled in New York that there is no property right to the continuation of at-will employment. *See, e.g.*, *Natalizio v. City of Middletown*, 754 N.Y.S.2d 24, 25 (App. Div. 2003). Federal courts have thus made it clear that there is no constitutionally-protected interest in the continuation of at-will employment in New York. *See, e.g.*, *Goetz v. Windsor Cent. Sch. Dist.*, 698 F.2d 606, 609 (2d Cir. 1983).

In the present case, the Plaintiffs do not dispute that they were at-will employees, and in fact admit that they were each classified as exempt under the Civil Service Law. See Pltf Oppn. Memo at 23-24. The Plaintiffs thus had no property right to their continued employment and employment benefits.

2. *Plaintiffs have failed to demonstrate that they have a property*

-12-

*interest in payment for their accrued "compensatory time."*

The Plaintiffs' "Count II" suggests a cause of action for the deprivation of property rights in the form of compensatory time earned during the course of their employment, for which the County "promised him [or her] compensation" at a rate of time and one-half, "in lieu of cash to be used at [his or her] discretion." See Complaint ¶¶ 49-52. This claim likewise fails.

The Supreme Court has rejected the notion that every "grievous loss visited upon a person by the state is sufficient to invoke the procedural protections of the due process clause." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). Rather, as suggested in the preceding sub-section, to state a cause of action under the due process clause "a plaintiff must show that she has a property interest, created by state law, in the employment or the benefit that was removed." *Bernheim v. Litt*, 79 F.3d 318, 322 (2d Cir. 1996).

The Supreme Court has long held that " '[t]he breach of a contract is neither a confiscation of property nor a taking of property without due process of law,' " *McCormick v. Oklahoma City*, 236 U.S. 657, 660 (1915) (quoting *Shawnee Sewerage & Drainage Co. v. Stearns*, 220 U. S. 462, 471 (1911)), and that a municipality's refusal to perform its contractual obligations thus does not deprive the other contracting party of property without due process of law. *Id.* (citing *Dawson v. Columbia Ave. Sav. Fund, S. D. Title & Trust Co.*, 197 U. S. 178, 181 (1905)). Thus, contract disputes between municipalities and their employees do not give rise to federal causes of action under section 1983, and should not be pursued "under the guise of a due process violation." *Costello v. Town of Fairfield*, 811 F.2d

-13-

782, 784 (2d Cir. 1987). More specifically, the Sixth Circuit has held that "interference with a property interest in a pure benefit of employment, as opposed to an interest in the tenured nature of employment itself, is an interest that can be and should be redressed by a state breach of contract action and not a federal action under section 1983." *Ramsey v. Bd. of Educ. of Whitley County, Ky.*, 844 F.2d 1268, 1272 (6th Cir. 1988) (rejecting retired teacher's claim that deprivation of accumulated sick leave violates due process) (*cited with approval in Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 784 (2d Cir. 1991)).

In *Gendalia v. Gioffre*, 606 F. Supp. 363, 366 (S.D.N.Y. 1985), the District Court addressed whether municipal employees had constitutionally cognizable entitlements to receive back pay for unused vacations and sick leaves, in light of Section 92 of New York's General Municipal Law. Section 92 states in relevant part that a town governing board "*may* grant vacations, sick leaves and leaves of absence to its officers or employees," and "*may* also in like manner provide for cash payment of the monetary value of accumulated and unused vacation time or time allowances granted in lieu of overtime compensation standing to the credit of its officers and employees at the time of their separation from their service." *Id.* (citing McKinney's General Municipal Law § 92(1)). The District Court noted that in light of relevant New York precedent and "the statute's clearly permissive language," it must be considered "purely permissive in nature." *Id.* at 367 (citations omitted). Accordingly, the Court refused to find a constitutionally protected property right to the back pay, and concluded that the town employees had "attempted to elevate a contract dispute to the level of Constitutional litigation." *Id.*

-14-

Similarly, in the present case the Plaintiffs cite no law or case that expressly and unconditionally supports their right to receive accrued compensatory time upon termination. Instead, they state that Nassau County "promised" them compensation, and assert that Nassau County violated "Section 3.30(b) of the Handbook Describing Benefits in Ordinance No. 543-195." As the Complaint notes, this provision "states that 'the estate of a deceased officer or employee shall be entitled to be paid . . . for all compensatory time earned and accumulated prior to the date of such officer's or employee's death.' " According to the Complaint, Nassau County violated this provision "in so much as the intent and spirit of §3.3(b) [sic] evidences that the Defendant acknowledged that an officer or employee, or their estate, is entitled to receive compensation for work performed by said individual as a matter of right in having earned said time." Complaint at ¶58.

The Plaintiffs neglect to note that Section 3.30(a) of the same handbook states that "[e]xcept as otherwise provided, *no* compensatory time is to be granted to officers and employees *except* in instances where, in the judgment of the department head, there are extraordinary circumstances. In such cases, the department head *may* award compensatory time to such officers and employees . . . ." Deft. Exh. P (emphases added). Thus, Nassau County's obligation to compensate the Plaintiffs for unused overtime is fundamentally permissive, and to the extent that Nassau "promised" the Plaintiffs compensation, their claim that compensation was denied sounds strictly in contract, not due process. This conclusion is supported by the Plaintiffs' own memorandum, which, in opposing summary judgment and arguing that they are entitled to cash for their "comp time," cites only "quantum meruit,

-15-

estoppel, and unjust enrichment" — all *contractual* doctrines. Pltf. Oppn. Memo. at 25. In sum, the Plaintiffs' "Count II" states, at best, a contractual cause of action under New York law. As explained in Part V, *infra*, this Court declines to exercise supplemental jurisdiction over any such cause of action.[2]

III.    *The Plaintiffs' First Amendment Claim Must Fail.*

The Plaintiffs' central allegation in this case is that they were terminated by the incoming Democratic Nassau County administration simply because of their affiliation with, and activities on behalf of, the Republican Party. Complaint ¶¶ 26-48. This, they argue, violated their free association rights under the First Amendment of the United States Constitution. Complaint ¶¶ 77-79. Nassau County asserts in response that (1) the Plaintiffs' terminations "were made on the merits[,] given the abysmal performance of the departments in which [they] worked" during the outgoing Republican administration; and that (2) even assuming that the Plaintiffs were terminated because of their political affiliation, such termination was proper in light of their status as "policymakers." Deft. Memo at 2. Because the latter point is dispositive, the Court will avoid addressing the former.[3]

---

[2]    The Federal Fair Labor Standards Act also allows public employees to receive compensatory time off in lieu of overtime for hours worked — but also only pursuant to contract. *See* 29 U.S.C. § 207(o). Even assuming there was such a contract between the Plaintiffs and Nassau County, the Plaintiffs are not covered by this law, as explained in Part IV, *infra*.

[3]    *See Ecker v. Cohalan*, 542 F. Supp. 896, 900-01 (E.D.N.Y. 1982) (as "the ultimate purpose animating governmental decisions is notoriously difficult to determine," where defendants assert political as well as non-political motive for terminating public employees, preferable course of action for court is to first assume political motive, and determine whether it is permissible in light of employee's position).

A.    *Overview: political dismissals, the First Amendment, and Elrod-Branti.*

As a general rule, terminating a public employee based on his or her political affiliation offends the First Amendment.  *See Regan v. Boogertman*, 984 F.2d 577, 579 (2d Cir. 1993); *and Catterson v. Caso*, 472 F. Supp. 833, 836 (E.D.N.Y. 1979).   However, a public employee's First Amendment rights are not absolute, and may be outweighed by the vital government interest in "efficiency and effective implementation of electorate-sanctioned policies."  *Regan*, 984 F.2d at 579.  In *Elrod v. Burns*, the U.S. Supreme Court held that in light of the vital need for effective elected government, patronage dismissals do not offend the First Amendment when restricted to policymaking positions. 427 U.S. 347, 372 (1976)).

In *Branti v. Finkel*, the Court refined this standard, holding that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."   445 U.S. 507, 518 (1980).  Although federal courts have continued to "use 'policymaker' as a 'convenient shorthand for a person occupying a position calling for party loyalty' within the meaning of the Elrod line of cases," *McEvoy v. Spencer*, 124 F.3d 92, 99 (2d Cir. 1997) (quoting  *Regan*, 984 F.2d at 580)),   "the 'policymaker' exception [is] broader than 'one who makes policy.' "  *Hobler v. Brueher*, 335 F.3d 1145, 1150 (9th Cir. 2003) (citation omitted).  The Second Circuit has interpreted Branti "as saying that political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance," and has explained that a narrower reading "would severely handicap an incoming

administrator's ability to carry out his proposed policies, thereby undercutting the effects of the electorate's vote." *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988).

In *Vezzetti v. Pellegrini*, the Second Circuit noted eight more specific factors that can indicate whether a public employee may be subject to partisan-based termination: whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders. 22 F.3d 483, 486 (2d Cir. 1994). However, the Circuit has emphasized that these factors "should not be mechanically applied, nor should [they] begin and end the analysis." *Gordon v. County of Rockland*, 110 F.3d 886, 890 (2d Cir. 1997).

The determination of whether a public employment position is exempt from First Amendment protection involves many of the same factors that New York considers in determining whether to exempt such a position from its civil service system: "the confidential nature of the position," "the performance of duties requiring the exercise of authority or discretion at a high level," or the need for "some expertise or personal qualities which cannot be measured by a competitive exam." *Savage*, 850 F.2d at 69 (quoting *Burke v. Axelrod*, 456 N.Y.S.2d 135, 137 (App. Div. 1982)). Thus, although employees are not automatically exempted from First Amendment protection just because they are exempt from civil service protection, *Gordon*, 110 F.3d at 890 n.5, the Second Circuit has stated that "[b]oth the interests of federalism and the conservation of judicial resources would ordinarily be better

served by the federal courts' giving substantial deference to the state's judgment." *Savage*, 850 F.2d at 69. "Otherwise, federal courts will be embroiled in determining at each change of state or local administration which positions are appropriately within the political patronage system," a determination that "not only creates the possibility of a super-civil service overseen by the courts, but allows the federal judiciary to intrude undesirably into the very structure of state and local governments." *Id.*

The Second Circuit has explained that the last four Vezzetti factors mentioned above "attempt to define the contours of a zone inside which governmental decisions are made," and "together encompass a principle of primary importance: whether the employee in question is empowered to act and speak on behalf of a policymaker." *Gordon*, 110 F.3d at 890. Where an employee "[gives] advice to and represent[s] top policymaking officials in the County," they are considered inside the "zone" of governmental decisionmaking. *Id.*

The *Elrod-Branti* inquiry focuses on "the duties inherent in the offices held by the plaintiffs," and not what the plaintiffs *actually did* while in office. *Gordon*, 110 F.3d at 888 ("The idea that job performance (rather than job description) should control *Elrod-Branti* analysis has been consistently rejected by this court and others.") (citations omitted). Thus, an employee's argument that he or she was merely "clerical" is unpersuasive where that employee's own description of his or her position indicates that it is confidential and involves close and substantial contact with policymaking officials. *See Stott v. Martin*, 725 F. Supp. 1365, 1434 (E.D.N.C. 1989), *rev'd sub nom. on other grounds*, *Stott v. Haworth*, 916 F.2d 134 (4th Cir. 1990). Although the determination of whether an employee is exempt from First

Amendment protection under *Elrod-Branti* is thus "inherently fact-specific in that it requires a court to examine the nature of the responsibilities of the particular job at issue," *Wetzel v. Tucker*, 139 F.3d 380, 383-84 (3d Cir. 1998), the Second Circuit treats the issue as one of law. *See Gordon*, 110 F.3d at 888-89.

The Second Circuit has applied *Elrod-Branti* to "h[o]ld a wide variety of jobs to be exempt from First Amendment Protection," *Gordon*, 110 F.3d at 890 (citations omitted), as have other federal courts; such exempted positions have included: confidential secretary, County Veterans Service Agency Deputy Service Officer, Pre-Trial Release Program Coordinator, assistant city attorney, assistant county attorney, Assistant Director of Public Information for county, First Deputy Commissioner of Department of Water; Superintendent of Employment for municipal Park District, city solicitor and assistant solicitor, town Senior Citizens' Coordinator, County Deputy Parks Commissioner, and State Director of the Farmers Home Administration. *See Stott v. Haworth*, 916 F.2d at 144 (citations omitted).

B.    *Nassau County is not "estopped" from asserting its "policymaker" defense.*

As an initial matter, the Plaintiffs argue — unpersuasively — that Nassau County "is estopped from claiming [that they] are policymakers," because it "has already litigated, in Unemployment, the policymaker issue and lost." Pltf. Memo at 25.

Under Section 565(2)(e) of the New York Labor Law, "a person in a major nontenured policymaking or advisory position" is not an "employee" for the purposes of an entitlement to unemployment benefits. *See In re Newell*, 779 N.Y.S.2d 287, 288 (App. Div. 2004). On January 21, 2003 an administrative law judge, over the County's objections, found

that Franzese "was not employed in a major nontenured policymaking or advisory position" and thus *is* eligible for unemployment benefits. Pltf. Exh. 23. The Plaintiffs apparently base their "estoppel" argument on this determination.[4]

Federal courts generally must give a state court's judgment the preclusive effects to which it is entitled under the laws of the state in which it was rendered. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 (1984). Where a state agency acts in a judicial capacity, federal courts must likewise give its factfinding the same preclusive effect to which it would be entitled in the courts of that state. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986).

New York courts give preclusive effect to an administrative agency's quasi-judicial determinations when: (1) an issue before the court is identical to a material issue necessarily determined by the agency; and (2) the party opposing preclusion had a full and fair opportunity to contest the issue in the administrative proceeding. *See Ryan v. N.Y. Tel. Co.*, 467 N.E.2d 487, 490-91 (N.Y. 1984). New York courts place the burden of demonstrating the identicality and materiality of an issue upon the party seeking preclusion, and the burden of establishing the absence of a full and fair opportunity to litigate the issue in a prior proceeding upon the party opposing preclusion. *Kaufman v. Eli Lilly & Co.*, 482

---

[4]    The Plaintiffs also hint that preclusive effects should derive from the County's default (for failing to produce any witnesses) at a similar hearing contesting Alberti's qualifications for unemployment benefits, and from the County's failure to contest the unemployment claims of the other three plaintiffs. Pltf. Memo at 5. This point is insufficiently briefed to be considered, and at any rate must fail for the same reason that the Plaintiffs' attempts to derive preclusive effects from the Franzese determination fail, as explained herein.

N.E.2d 63, 67 (N.Y. 1985)

To determine whether the party against whom preclusion is sought had a full and fair opportunity to litigate a pertinent issue in a prior proceeding, New York courts consider various factors, include the party's incentive to litigate the issue in the prior proceeding. *See Clemens v. Apple*, 481 N.E.2d 560, 560 (N.Y. 1985). Lack of a full incentive to litigate earlier weighs against the application of collateral estoppel. *See Buechel v. Bain*, 766 N.E.2d 914, 926 (N.Y. 2001) (Levine, J., dissenting) ("our precedents hold[] that a party is denied a full and fair opportunity to litigate in a prior action when a practical inquiry into the realities of litigation reveals that the party lacked any serious incentive to fully and vigorously participate.") (internal quotations and citation omitted).

The Plaintiffs' argument assumes that a "policymaker" exempt from unemployment benefits under the New York Labor Law is identical to a "policymaker" exempt from First Amendment patronage protection under the *Branti* analysis. However, the Plaintiffs do not support this assumption with any authority, and this Court was unable to locate any such authority independently. As the Second Circuit has noted, the "policymaker" label is merely "a convenient shorthand for a person occupying a position calling for party loyalty." *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1993). And as the Seventh Circuit has noted, this "deceptively simple standard" has been applied to "a wide range of government positions, which in turn involve an endless variety of job responsibilities and varying degrees of discretion and autonomy." *Flenner v. Sheahan*, 107 F.3d 459, 465 (7th Cir. 1997). The Plaintiffs offer nothing to indicate that New York Labor Law's "policymaker" rule is defined or applied as

broadly as the *Elrod-Branti* "shorthand." Thus, the Plaintiffs fail to demonstrate that the issue before this Court is identical to the issue determined at the previous administrative adjudication.

Moreover, as Nassau County points out, an employer's incentives to litigate a terminated employee's unemployment insurance claims before an administrative law judge are insignificant relative to its incentives to litigate the employee's subsequent federal civil rights action. In *Gore v. R.H. Macy & Co., Inc.*, Judge Mukasey noted that "the importance of plaintiff's unemployment claim and defendant's incentive to litigate it were minuscule compared to the potential liability defendant faces on the [civil rights] claims advanced here." 1989 WL 65561, at *3 (S.D.N.Y. June 13, 1989). In the present case as well, the defendant's incentives to litigate before the ALJ were disproportionately small: Franzese's annual salary had been $70,000, as noted; by contrast, each Plaintiff is presently seeking "back pay and all other emoluments of employment which [he or she] would have received if not wrongfully terminated," plus interest thereon, plus $500,000 in compensatory damages, plus $1 million in punitive damages, plus attorney's fees, costs, and expenses. Complaint ¶88. Thus even assuming that a "policymaker" under New York Labor Law is a "policymaker" under the First Amendment, it cannot fairly be stated that the County had a full and fair opportunity to litigate this issue at the prior administrative proceeding, and applying "preclusion" against the County on this issue would be inappropriate.

     C.    *Each Plaintiff's termination was constitutionally permissible under Branti.*

         1.    *Alberti*

The Plaintiffs insist that while Alberti served as "Counselor" in the Nassau County Office of Housing and Intergovernmental Affairs and had "some technical expertise as an attorney," Pltf. Oppn. at 23, she was "not a policymaker," as she "just interpreted the law," and merely gave "technical legal advice." Pltf. R.56.1 Counter-statement ¶ 16. This argument lacks merit.

As stated above, it is the inherent function of an office, and not what an employee actually does while occupying it, that determines whether it is appropriately exempted from First Amendment anti-patronage protection. As the Sixth Circuit has noted, "some public jobs are political by nature, regardless of the duties actually performed by the plaintiff." *Faughender v. City of North Olmsted, Ohio*, 927 F.2d 909, 914-15 (6th Cir. 1991). *See also Mendez-Palou v. Rohena-Betancourt*, 813 F.2d 1255, 1263 (1st Cir. 1987) (holding that "regardless of what duties [the plaintiff] actually performed during his tenure" at Puerto Rico's Aqueduct and Sewers Authority, "the inherent power of [his] position of Deputy Executive Director of Special Affairs easily encompasses policymaking, communicative, and confidential tasks that could have a direct bearing on the partisan goals and policies of the agency").

Federal courts have uniformly held that government attorneys occupy such positions inherently demanding political loyalty, and that they thus fall within the *Branti* exemption from First Amendment protection. *See Gordon v. County of Rockland*, 110 F.3d 886, 890 (2d Cir. 1997) ("All circuit court decisions — and almost all other court decisions — involving attorneys in government service, other than public defenders, have held that *Elrod*

/*Branti* do not protect these positions.") (citation omitted); *see also Aucoin v. Haney*, 306 F.3d 268, 275 (5th Cir. 2002) (collecting cases). Conversely, the Second Circuit and other federal courts have largely rejected arguments by government attorneys claiming First Amendment protection because they merely gave "technical legal advice"or engaged in ministerial tasks, and did not make policy; what counts is whether the attorney *can* or *could* engage in tasks for which partisan or ideological affiliation likely affects performance. *Gordon*, 110 F.3d at 891 (citing *Williams v. City of River Rouge*, 909 F.2d 151, 153-56 (6th Cir. 1990) *and Ness v. Marshall*, 660 F.2d 517, 521-23 (3d Cir. 1981)); *see also Collins v. Voinovich*, 150 F.3d 575, 578 (6th Cir. 1998) (noting that an attorney who "performed the politically neutral and essentially technical job of providing legal advice upon request" could be discharged for political affiliation under *Branti*). As "Counselor," Alberti was responsible for reviewing and drafting legal documents, answering legal questions received by the Housing Office, and serving as a "liaison to the Legislature." The Plaintiffs' attempts to paint her job as merely clerical or "technical" are thus clearly at odds with these holdings.

The Sixth Circuit has also noted that "[a]s political action cannot occur without communication, a position that controls the lines of communication of a political actor must be inherently political"; such a position "involves access to confidential and political material, and political loyalty, whether partisan or personal, is an essential attribute of the job." *Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909, 914 (6th Cir. 1991). Numerous federal courts have held that employees serving a government in "representative," "spokesperson," or "liaison" capacities are exempt from First Amendment protection under

*Branti* and its progeny. *See*, *e.g.*, *Gordon*, 110 F.3d at 890 (employees who represented county in meetings with elected officials exempted); *Aiken v. Rio Arriba Bd. of County Comm'rs*, 134 F. Supp.2d 1216, 1222 (D.N.M. 2000) (same); *Hoard v. Sizemore*, 198 F.3d 205, 215 (6th Cir. 1999) ("Given . . . the fact that the assistant road foreman may be called upon to serve as the executive's liaison with the public as far as road conditions are concerned, the position can only be seen as inherently political."). Since one of Alberti's job titles was "liaison to the Legislature," she would seem to fall squarely within another common *Branti* exemption.

The Plaintiffs argue that Alberti's responsibility for communicating with the legislature was limited to "basic, non-controversial issues." Pltf. R.56.1 Statement ¶ 18. But the Plaintiffs offer no authority whatsoever to support their suggestion that government employees must communicate with legislators on "important" or "controversial" topics in order to receive protection from patronage dismissals. The Seventh Circuit has indicated that such a notion is erroneous. *See Tomczak v. City of Chi.*, 765 F.2d 633, 641 (7th Cir. 1985) (official charged with "mundane decisions" in "seemingly apolitical context" may still be unprotected under *Branti*). Alternatively, the Plaintiffs argue that Alberti "had virtually no contact with elected officials in her last position," Pltf. Oppn. at 23, an assertion that clearly ignores the numerous federal cases stressing that "policymaker" status depends on the inherent responsibilities of an office, not its occupant's actual accomplishments.

In sum, Alberti's legal duties as "Counselor," her communicative position as "liaison" representing the Housing Office before the Legislature, and her exemption from civil

service protection, together indicate that under the *Elrod-Branti* line of cases, she is not protected from politically-motivated termination.

### 2. *Califano*

The Plaintiffs insist that notwithstanding Califano's title as "Manager of Budget Analysis" in the Nassau County Office of Management and Budget, his duties were merely to "make sure that [budget requests] were totaled up properly," hand them to his director, and sometimes reduce such requests by varying percentages as instructed. Pltf. R.56. Statement ¶28. The Plaintiffs similarly state that as a member of both the "Capital Committee" and the County "negotiating team," Califano "attended meetings but had no say," "just sat there and listened," and "played no role in negotiations and had no input." Pltf. R.56. Statement ¶30. And the Plaintiffs assert that as "liaison" between Nassau County and the Nassau County Correctional Center, Califano merely relayed messages, and was not privy to confidential information. Pltf. R.56. Statement ¶36. Even assuming the truth of these assertions, Califano is still exempt under *Branti*.

Although "labels or job titles are [not] relevant to the inquiry into whether patronage dismissal is permissible," *Flenner v. Sheahan*, 107 F.3d 459, 463 (7th Cir. 1997), a public employee's direct appointment by an elected official indicates policymaking or confidential status. *See McEvoy v. Spencer*, 124 F.3d 92, 104 (2d Cir. 1997) (police commissioner's direct appointment by mayor indicative of policymaking status); *and Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1356 n.13 (3d Cir. 1994) (suggestion that Port Authority be kept "out of patronage and partisan politics" is "not feasible," as state

governors directly appoint most of its commissioners). As noted, Califano was appointed to be Manager of Budget Analysis by the Nassau County Executive, and was promoted to his position at the Correctional Center by the Executive as well.

As noted previously, a position that "controls the lines of communication of a political actor must be inherently political," as it "involves access to confidential and political material." *Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909, 914 (6th Cir. 1991). The fact that an employee represents a governmental department at meetings or conferences similarly indicates that the employee is in a confidential position, and that his position demands political affinity with those he represents. *See, e.g.*, *Vazquez Rios v. Hernandez Colon*, 819 F.2d 319, 328 (1st Cir. 1987). The fact that the employee does not actively participate in such meetings is not determinative; federal courts have stated on several occasions that an employee who acts as the "eyes and ears" of a policymaker at meetings is himself in a confidential relationship with the policymaker, unprotected under *Branti*. *See, e.g.*, *Ortiz Pinero v. Rivera Acevedo*, 900 F. Supp. 574, 581 (D.P.R. 1995). In the present case, Califano has stated that while "representing the budget office," and at the behest of the budget director, he "sat in on county negotiations." Califano Depo at 21-22. He also sat in on meetings of the "senior" capital committee, just to "listen to what they had to say." Califano Depo at 13. It is exceedingly hard to imagine that Califano attended these meetings merely for the personal enjoyment he derived from listening. The only reasonable assumption is that he was listening with the intent of reporting back to the director.

Additionally, the Third Circuit has stated that "the key factor" in the *Branti*

analysis is "not whether the employee was a supervisor or had a great deal of responsibility," but whether he had "meaningful input into decision making concerning the nature and scope of a major [governmental] program." *Brown v. Trench*, 787 F.2d 167, 169-70 (1986) (citations omitted). Although the Plaintiffs assert that Califano never had any final say over budgetary proposals, it is clear that his position involved at least some meaningful input. As Califano stated, the director depended on him to make initial determinations as to which spending requests were "reasonable" — an inherently discretionary determination.

Finally, as already noted, Califano was exempt from civil service protection. In sum, the undisputed facts indicate that Califano occupied a sufficiently political, confidential, and influential position to be exempt from First Amendment protection under the *Branti* test.

3.    *Franzese*

The Plaintiffs argue that as "Assistant to the Coordinator" of Housing, Franzese "only offered his opinions on certain suggestions by the Coordinator," but did not "work[] alongside the Commissioner with regard to decisions on how to implement policies," Pltf. R.56 Statement ¶58, and "was not responsive to partisan politics." Pltf. Memo. at 24. The Plaintiffs are not helped by this distinction, which ignores the fact that *Branti's* scope extends beyond officials who are overtly "political," or who officially "make policy." The Plaintiffs' own statements in fact demonstrate that *Branti* applies to Franzese.

As the First Circuit has explained, "an employee is not immune from political firing merely because the employee stands apart from 'partisan' politics, or is not the ultimate decisionmaker in [an] agency, . . . . Rather, it is enough that the official be involved in policy,

even if only as an adviser, implementer, or spokesperson." *Flynn v. City of Boston*, 140 F.3d 42, 46 (1st Cir. 1998); *see also Legg v. DellaVolpe*, 228 F. Supp.2d 51, 60 (D. Conn. 2002) (noting that the "advisor" to an elected official "may be privy to confidential information or sensitive opinions" that "encompass political concerns"). More importantly, the Supreme Court itself has noted that "[a]n employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position." *Elrod v. Burns*, 427 U.S. 347, 368 (1976).

Franzese's role, as the Defendants state, was to offer his opinion on "how things ran," and then "make sure that whatever the commissioner wanted was done." His inherently broad responsibilities to the Coordinator as both advisor and implementer, as well as his exemption from civil service protection and admitted "technical competence" show that he is properly excluded from First Amendment protection under *Branti*.

### 4. *Nigra*

The Plaintiffs argue that Nigra's role as "Budget Examiner" was "ministerial," and that he was simply "a conduit through which the information flowed," in that he "took the information provided to him and inputted it into the computer," and only approved proposed spending where "there was money in the budget." Pltf. R.56.1 Statement ¶¶73-74, 77. But Nigra's own statements indicate that his responsibilities were more significant than that, and ran into "policymaking."

Expertise in "municipal budget oversight," is a strong indicator of "policymaking" status. *See Fry v. McCall*, No. 95 Civ.1915, 1998 WL 770563, at *6

(S.D.N.Y. Nov. 4, 1998). And an employee charged with determining "[h]ow an agency's income is spent and how fiscal policy is analyzed . . . has more than the required 'modicum' of policymaking responsibility." *Nunez v. Izquierdo-Mora*, 834 F.2d 19, 23 (1st Cir. 1987). In describing his duties, Nigra stated that he could reject budgetary requests from the departments he oversaw "because of a feeling that they might not need particular items," and that he could suggest ways of trimming such requests to make them more acceptable. Nigra Depo. at 30-31. This indicates that Nigra was charged with more than mere "number crunching" or "data entry." Moreover, these duties involved direct interaction with the heads or representatives of multiple County departments or agencies, who came to him first with their requests. Nigra was also tasked with appearing before the Legislature to "supplement" information provided by the budget director or department heads. In these roles, Nigra functioned as a liaison between the budget director and various other departments and officials — a duty which, as previously discussed, exempts his job from First Amendment protection under *Branti*. *See Feeney v. Shipley*, 164 F.3d 311, 321 (6th Cir. 1999) (Traffic Safety Supervisor's service as liaison between other departments and public officials made him "an indispensable line of communication" in state government).

Nigra's clear expertise, his relative leeway in determining whether to approve budget requests, his interactions with other County officials, and his exemption from civil service protection together show that he was not entitled to First Amendment protection under *Branti*.

  5.  *Visconti*

In light of the cumulative weight of the discussions above, little time need be spent addressing the Plaintiffs' suggestion that Visconti was not the type of employee for whom party affiliation is an appropriate requirement for the effective performance of his office. Visconti was responsible for serving as "a go-between between the county legislature and the county executive," relaying what occurred in meetings to the Counselor to the County Executive, and voting on which capital projects could appear before the County Legislature. He thus had a key role in serving as a channel for communications between the various elected branches of Nassau County, and in affecting legislative policy as well. Visconti was also personally appointed by the County Executive, and was exempt from civil service protection. In sum, like the other Plaintiffs, Visconti is exempt from First Amendment protection under *Branti* and its progeny.

IV.     *The Plaintiffs Are Exempt "White Collar" Employees Under the FLSA.*

As noted earlier, the Plaintiffs allege that Nassau County's refusal to pay Alberti, Califano, Nigra, and Visconti accrued compensatory time violated the Federal Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. In moving for summary judgment on this claim, Nassau County argues that all four of the above Plaintiffs fall within the "white collar" exemption to the FLSA's overtime and compensatory time provisions. The County is correct.

Although the Plaintiffs do not specify which provision of the FLSA was violated, they are presumably suing pursuant to its Section 7, which states in relevant part that "[e]mployees of a public agency which is . . . a political subdivision of a State . . . may

receive, . . . in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section." 29 U.S.C. § 207(o)(1). The FLSA also entitles an eligible employee to cash payment for any accrued compensatory time remaining upon his or her termination. *Christensen v. Harris County*, 529 U.S. 576, 580 (2000) (citing 29 U.S.C. § 207(o)(4)). But Section 13(a) of the FLSA states in relevant part that "[t]he provisions of . . . section 207 of this title shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity."[5] 29 U.S.C. § 213(a)(1). The issue in this case is whether, as the County argues, the Plaintiffs were all employed in bona fide executive, administrative, or professional capacities.

The FLSA does not define the terms "executive," "administrative," or "professional" for purposes of the exemption, but directs the Secretary of Labor to do so by regulation. 29 U.S.C. § 213(a)(1). The Secretary's regulations have the force of law, and are generally given controlling weight. *Freeman v. Nat'l Broad. Co., Inc.*, 80 F.3d 78, 82 (2d Cir. 1996). Because the FLSA is a remedial statute, its exemptions must be narrowly construed, and an employer bears the burden of proving that its employees fall within one of those exemptions. *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991).

For an employee earning over $250 per week, federal courts hold that the

---

[5]     Although term "white collar" does not appear in FLSA's Section 13(a), federal courts, and even FLSA's own regulations, refer to this section as "the white collar exemption." *See Wright v. Aargo Sec. Servs., Inc.*, 2001 WL 91705, at *2-3 (S.D.N.Y. Feb. 2, 2001) (citations omitted).

pertinent Department of Labor regulations require application of a "short test" to determine whether that employee is exempt from FLSA overtime requirements. *Id.* (citing 29 C.F.R. § 541.3(e)). The Plaintiffs do not dispute the fact that they earned more than $250 per week, and hence, that the "short test" applies to them. The short test contains two independent criteria, the "salary basis" and the "duties" test; an employee must meet both in order to be exempt from the FLSA's overtime provisions. *See Schwind v. EW & Assocs., Inc.*, 357 F. Supp.2d 691, 703 (S.D.N.Y. 2005). The "salary basis" inquiry merely asks whether a purportedly exempt plaintiff was paid a salary during the period in which he was classified as an employee of the defendant. *Id.* Since the Plaintiffs do not dispute that they were salaried employees, the key question is only whether or not their duties exempted them from FLSA coverage.

An employee works in an FLSA-exempt "administrative capacity" under the short test if his or her primary duty consists of the "performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers." *Kahn v. Superior Chicken & Ribs, Inc.*, 331 F. Supp.2d 115, 118 (E.D.N.Y. 2004) (citing 29 C.F.R. § 541.2(e)(2)). An employee works in an FLSA-exempt "professional capacity" under the short test if he or she possesses "knowledge be of an advanced type." *Tomney v. Int'l Ctr. for Disabled*, 357 F. Supp.2d 721, 739 (S.D.N.Y. 2005). That means "generally speaking, knowledge which cannot be attained at the high school level," is in a "field of science or learning," and is "customarily acquired by a prolonged course of specialized intellectual instruction and study," typically symbolized and evidenced by an academic degree — preferably an advanced degree. *Id.*

To be "professional" or "administrative," under the "short test," an employee's duties must also require the exercise of "discretion and independent judgment." *See Kahn*, 331 F. Supp.2d at 118, *and Tomney*, 357 F. Supp.2d at 739-40. As one court has summarized, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." *Dambreville v. City of Boston*, 945 F. Supp. 384, 394 (D. Mass. 1996) (citing 29 C.F.R. § 541.207(a)). This "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance," but does not require that such choice "have a finality that goes with unlimited authority and a complete absence of review." *Id.* (citing 29 C.F.R. § 541.207(a), and § 541.207(e)(1)).

The determination of whether an employee is exempt from the FLSA based on his or her duties is often considered one of fact and law. *See Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp.2d 216, 220 (D. Conn. 2003) (quoting *Cooke v. Gen. Dynamics Corp.*, 993 F. Supp. 56, 59-61 (D. Conn. 1997). But it is a strict question of law whether the activities and responsibilities of the employee, once established, exempt him or her from the FLSA's overtime requirements. *Tomney v. Int'l Ctr. for Disabled*, 357 F. Supp.2d 721, 739-40 (S.D.N.Y. 2005) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). Where, in light of undisputed facts in the record, a reasonable factfinder could only find that the employee was an administrator or professional, and that he or she consistently exercised independent discretion and judgment, a court may hold that as a matter of law he or she is

exempt from FLSA overtime requirements. *Tomney*, 357 F. Supp.2d 740-41.

Under the above standards, each of the four Plaintiffs' deposition testimony reveals that his or her duties were clearly primarily professional or administrative under the short test. Alberti, an attorney who reviewed legal documents, drafted legal forms, answered subpoenas, and gave legal advice (however basic or uncontroversial), had undeniably professional duties that demanded the exercise of independent discretion and judgment. Califano's responsibility for reviewing the reasonableness of various proposed expenditures, directly related to the management policies or general business operations of Nassau County, and clearly demanded the exercise of discretion and judgment. Nigra prepared spending projections, analyzed expenditures, and controlled spending by approving or disapproving purchases, all based on his knowledge of the resources and activities of each County department; these tasks were likewise administrative and likewise required the exercise of independent judgment and discretion. Finally, Visconti served as a member of the "capital committee" and voted on whether proposed capital projects would be sent to the County Legislature; clearly this position as well related to the management policies or general business operations of Nassau County and required the exercise of discretion.

Because each of these four Plaintiffs is clearly either a "professional" or an "administrator" under the Department of Labor's "short test," each falls within the white collar exemption to the FLSA. The Plaintiffs' cause of action to recover overtime benefits under that statute must accordingly fail as a matter of law.

V.     *The Court Declines To Exercise Supplemental Jurisdiction over Plaintiffs' State-Law Claims.*

As each of the Plaintiffs' purported federal claims must fail, the next issue is whether the exercise of pendant jurisdiction over their remaining state law claims is appropriate. It is not.

"[T]he exercise of pendent jurisdiction is generally a matter for the exercise of a district court's discretion." However, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)). Since each federal cause of action has now been eliminated from the present case, the exercise of federal supplemental jurisdiction is clearly unwarranted, and is accordingly declined.

*CONCLUSION*

For all of the above reasons, the Defendant's motion for summary judgment is GRANTED, and the Plaintiffs' claims are dismissed in their entirety. The Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

Dated:  Central Islip, New York
        September 30, 2005                                    /s/_____
                                                             Denis R. Hurley
                                                             United States District Judge